Robert V. Prongay (SBN 270796)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: prajesh@glancylaw.com

Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
Email: bsachsmichaels@glancylaw.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRUNG NGUYEN, Derivatively on Behalf of Nominal Defendant BERKELEY LIGHTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ERIC D. HOBBS, SHAUN M. HOLT, KURT WOOD, SARAH BOYCE, JOHN CHIMINSKI, IGOR KHANDROS, GREGORY LUCIER, MICHAEL MARKS, MICHAEL MORITZ, ELIZABETH NELSON, and JAMES ROTHMAN, <br><br> Defendants. <br><br> and <br><br> BERKELEY LIGHTS, INC., <br><br> Nominal Defendant. | Case No. <br><br><br><br><br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Trung Nguyen ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Berkeley Lights, Inc. ("Berkeley Lights" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (i.e. *Brophy* claim), and contribution for violations of § 10(b) of the Exchange Act. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Berkeley Lights with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.  NATURE AND SUMMARY OF THE ACTION

1.  Berkeley Lights is a biotechnology company that has created a platform to access and understand live primary biology with "unprecedented speed and scale." A majority of its revenue is derived from direct platform sales, which primarily refers to the sale of the advanced automation system or Berkeley Lights platform. In a classic razor-razorblade scheme, the Company's Berkeley Lights platform is the "razor," and the OptoSelect chips are the "blades" that generate recurring revenue.

2.  After its initial public offering in July 2020, the Company repeatedly touted its technology as the producing the "best cells" at a "level of scale and precision [that] is not attainable with other approaches." Management also claimed that the Company achieved continued product revenue growth.

3.  Meanwhile, insiders sold more than $175 million worth of Berkeley Lights stock.

4.  Then, on September 15, 2021, Scorpion Capital published a research report criticizing the Company's technology and questioning its business relationships and business growth plan. Citing interviews with former employees, industry scientists, and end users across 14 of Berkeley Lights's largest customers, the report alleged that a "trail of customers . . . were 'tricked,' misled, or over-promised into buying a $2 million lemon." The report alleged that the

Company experienced declining sales which was masked by channel stuffing through a related party.

5. On this news, the Company's stock price fell 30% over two consecutive trading sessions to close at $23.53 per share on September 16, 2021, on unusually heavy trading volume.

6. These revelations precipitated the filing of a securities class action in this District against Berkeley Lights and certain of defendants, captioned *Ng v. Berkeley Lights, Inc., et al.*, Case No. 21-cv-09497 (the "Securities Class Action").

7. Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board. The Board is currently composed of nine members, seven of whom are named in this action. As alleged herein, these seven members knew or recklessly disregarded that the Company's product was deeply flawed and that sales were declining. Moreover, Marks, Rothman, and Khandros sold nearly $175 million in Berkeley Lights stock while in possession of material nonpublic information. Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

III.   **PARTIES**

**Plaintiff**

10.   Plaintiff Trung Nguyen is a current shareholder of Berkeley Lights. Plaintiff has continuously held Berkeley Lights common stock at all relevant times.

**Nominal Defendant**

11.   Nominal Defendant Berkeley Lights is a Delaware corporation with its principal executive offices located at 5858 Horton Street, Suite 320, Emeryville, CA 94608.   The Company's stock trades on the NASDAQ exchange under the symbol "BLI."

**Defendants**

12.   Defendant Eric D. Hobbs ("Hobbs") served as Chief Executive Officer ("CEO") and as a director of the Company from March 2017 to March 9, 2022. He is named as a defendant in the Securities Class Action.

13.   Defendant Shaun M. Holt ("Holt") served as Chief Financial Officer ("CFO") of the Company from March 2016 to March 15, 2021. He is named as a defendant in the Securities Class Action.

14.   Defendant Kurt Wood ("Wood") has served as CFO of the Company since March 15, 2021. Prior to that, he was Vice President of Business Development. On March 9, 2022, the Company announced that Wood would leave his post on April 1, 2022. He is named as a defendant in the Securities Class Action.

15.   Defendant Sarah Boyce ("Boyce") has served as a director of the Company since August 2019.

16.   Defendant John Chiminski ("Chiminski") has been a director of the Company since May 14, 2021.

17.   Defendant Igor Khandros ("Khandros") has served as a director of the Company since 2011.

18.   Defendant Gregory Lucier ("Lucier") has served as a director of the Company since June 2020.

19.     Defendant Michael Marks ("Marks") served as a director of the Company from April 2014 to May 14, 2021.

20.     Defendant Michael Moritz ("Moritz") has served as a director of the Company since April 2015.

21.     Defendant Elizabeth Nelson ("Nelson") has served as a director of the Company since September 2019.

22.     Defendant James Rothman ("Rothman") has served as a director of the Company since May 2016.

23.     Defendants Hobbs, Holt, Wood, Boyce, Khandros, Lucier, Marks, Moritz, Nelson, and Rothman are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Parties**

24.     Siddhartha Kadia ("Kadia") has been the CEO of the Company since March 9, 2022 and as a director since September 2021.

25.     Jessica Hopfield ("Hopfield") has been a director of the Company since December 15, 2021.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers, directors, and/or fiduciaries of Berkeley Lights and because of their ability to control the business and corporate affairs of Berkeley Lights, at all relevant times, the Individual Defendants owed Berkeley Lights and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Berkeley Lights in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Berkeley Lights and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Berkeley Lights and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Berkeley Lights, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Berkeley Lights, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

28.     To discharge their duties, the officers and directors of Berkeley Lights were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Berkeley Lights were required to, among other things:

     a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

     b.  Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

     c.  Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

     d.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

29.     Berkeley Lights is a biotechnology company that has created a platform to access and understand live primary biology with "unprecedented speed and scale." A majority of its revenue is derived from direct platform sales, which primarily refers to the sale of the advanced automation system or Berkeley Lights platform. In a classic razor-razorblade scheme, the

Company's Berkeley Lights platform is the "razor," and the OptoSelect chips are the "blades" that generate recurring revenue.

30.     The Berkeley Lights platform can be used to characterize the performance of cells relevant to the desired cell-based product and connect the phenotypic data to the genetic code for each cell

**B.     The Individual Defendants Caused the Company to Issue Materially Misleading Statements**

31.     On July 17, 2020, the Individual Defendants caused Berkeley Lights to file its prospectus on Form 424B4 with the SEC for its initial public offering. It touted the superiority of the Berkeley Lights platform as the leading technology, claiming that it provides "the most advanced environment for rapid functional characterization of single cells at scale." It also claimed that the Company's platform delivers "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications" at a "level of scale and precision [that] is not attainable with other approaches." The filing further stated that the Berkeley Lights platform enabled customers "to find the best cells" by offering advanced capabilities, including:

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing and analyzing a rich data library for each single cell.

32.     The July 2020 prospectus also touted the Company's purported operational and financial growth, stating that direct platform sales increased to $39.1 million for fiscal 2019, an 84% increase over the prior year. This growth purportedly continued in the first quarter of 2020

during which Berkeley Lights generated $9.4 million in direct platform sales. As such, the total addressable market for the Company's business was "$23 billion."

33. The above statements in ¶¶ 31-32 were materially misleading because they failed to disclose: (i) that Berkeley Lights's flagship instrument was deeply flawed and suffered from breakdowns, high error rates, and data integrity issues; (ii) that, as a result, the Company's revenues were declining, which were masked by channel stuffing through a related party; and (iii) that, as a result of the foregoing, the Company's total addressable market was overstated.

34. On August 25, 2020, the Individual Defendants caused Berkeley Lights to issue a press release announcing its second quarter 2020 financial results, reporting total revenue of $10.6 million and four platform placements. Moreover, the Company generated $7.5 million in direct platform revenue, compared to $6.9 million in the prior year period.

35. The same day, the Individual Defendants caused Berkeley Lights to file its quarterly results on Form 10-Q for the period ended June 30, 2020, affirming the previously reported financial results. It was signed by defendants Hobbs and Holt. The report claimed that the Berkeley Lights platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process." Regarding the increase in product revenues, the report stated:

> Product revenue increased by $1.3 million, or 17%, for the three months ended June 30, 2020, compared to the three months ended June 30, 2019. The increase was primarily driven by an increase of $0.8 million in consumables sales driven by additional demand from our customers due to the increase in our installed base as well as increased activity by our customers related to the COVID-19 pandemic, an increase of $0.4 million in revenue from direct platform and system sales driven by regional mix of the platform placements during the three months ended June 30, 2020, including license arrangements related to our workflows, and an increase of $0.1 million in workflow subscription revenue.

36. The above statements in ¶¶ 34-35 were materially misleading because they failed to disclose: (i) that Berkeley Lights's flagship instrument was deeply flawed and suffered from breakdowns, high error rates, and data integrity issues; (ii) that, as a result, the Company's revenues were declining, which were masked by channel stuffing through a related party; and (iii) that, as a result of the foregoing, the Company's total addressable market was overstated.

37.     On November 12, 2020, the Individual Defendants caused the Company to announce its third quarter 2020 financial results in a press release. It reported $18.2 million in total revenue, including $12.4 million in direct platform revenue, an increase over the prior year period.

38.     The same day, the Company held an earnings call in connection with the financial results. During the call, defendant Hobbs reiterated that the Company offered "the most advanced environment for functional testing of live single cells." He also stated that the platform "enables customers to perform standardized and automated workflows with precise control over the environment, which enables functional testing of tens of thousands of live single cells in parallel." He further stated that the Company's machines created "the largest data cube for single cells in the industry" and that Berkeley Lights was "the only Company commercializing a platform that can do this in a scalable way." Defendant Hobbs also cited the tailwinds driving the Company's sales growth:

> We saw an increase in the current revenues, which were up 26% from last quarter and up 92% year-over-year. Growth over the prior quarter, was seen across all geographical regions, with Asia leading new platform placements, followed by Europe and the United States. Revenue was driven by strong demand for the discovery and development of cell-based products, especially for antibody therapeutic workflows. We continue to see capacity expansion in the industry led by strong investment activity in the CRO, CDMO space. In addition, the trend of increasing functional single-cell characterization continues to gain momentum, which is a key driver in our long-term growth strategy and core to our mission at Berkeley Lights.

39.     The same day, the Individual Defendants caused Berkeley Lights to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2020, affirming the previously reported financial results. The report was signed by defendants Hobbs and Holt. It claimed that the Berkeley Lights platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process." Regarding the increase in product revenues, the report stated:

> Product revenue increased by $0.9 million, or 7%, for the three months ended September 30, 2020, compared to the three months ended September 30, 2019. The increase was primarily driven by an increase of $1.0 million in consumables sales driven by additional demand from our customers due to the increase in our installed base, as well as workflow subscription revenue of $0.2 million. This increase was offset by a decrease in platform sales of $0.4 million resulting from the mix of

system type placed as well as the regional mix of placements. During both of the three months ended September 30, 2020 and 2019, we sold 8 platforms.

40.     The above statements in ¶¶ 37-39 were materially misleading because they failed to disclose: (i) that Berkeley Lights's flagship instrument was deeply flawed and suffered from breakdowns, high error rates, and data integrity issues; (ii) that, as a result, the Company's revenues were declining, which were masked by channel stuffing through a related party; and (iii) that, as a result of the foregoing, the Company's total addressable market was overstated.

41.     On November 19, 2020, the Individual Defendants caused Berkeley Lights to file a prospectus on Form 424b4 for a secondary public offering, just four months after the initial public offering. It touted the Berkeley Lights platform as "the most advanced environment for rapid functional characterization of single cells at scale" performing at a "level of scale and precision [that] is not attainable with other approaches." It also stated that the platform delivers "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications." The filing further stated that the Berkeley Lights platform enabled customers "to find the best cells" by offering advanced capabilities, including:

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing and analyzing a rich data library for each single cell.

42.     The above statements in ¶ 41 were materially misleading because they failed to disclose: (i) that Berkeley Lights's flagship instrument was deeply flawed and suffered from breakdowns, high error rates, and data integrity issues; (ii) that, as a result, the Company's

revenues were declining, which were masked by channel stuffing through a related party; and (iii) that, as a result of the foregoing, the Company's total addressable market was overstated.

43. On February 25, 2021, the Individual Defendants caused Berkeley Lights to announce its fourth quarter and full year 2020 financial results in a press release that reported $21.7 million total revenue for the quarter and $64.3 million total revenue for the year.

44. The same day, the Company held an earnings call in connection with the financial results. During the call, defendant Hobbs cited "three key tailwinds that are driving growth across [the Company's] markets," stating:

> First, demand for cell-based products is growing. Second, the complexity of cell-based products is increasing, requiring more precise multifunctional assays with the highest resolution. And third, there are new therapeutic modalities, including multi-specific antibodies, cell and gene therapies using DNA or mRNA therapeutics, which require precise functional validation.

> As a result of these tailwinds, the number of customers is growing, with many smaller biotech companies chasing specific drug targets with even shorter drug development times. This is creating rapid growth in the number of CDMO customers that we serve and provides us with the opportunity to offer different access models for our technology and attract new customers onto the Berkeley Lights platform.

45. During the same call, defendant Wood stated that Berkeley Lights experienced robust direct platform sales growth, stating "direct platform sales totaled $44.7 million in 2020 and $15.3 million in the fourth quarter of 2020, increasing by 14% and 39%, respectively, over the prior year periods." He went on to state that the Company "continue[d] to expand [its] customer base, with 18 replacements coming from new customers and nine being repeat orders. This brought our install base to 75 system at year end, a 56% increase over 2019."

46. The above statements in ¶¶ 43-45 were materially misleading because they failed to disclose: (i) that Berkeley Lights's flagship instrument was deeply flawed and suffered from breakdowns, high error rates, and data integrity issues; (ii) that, as a result, the Company's revenues were declining, which were masked by channel stuffing through a related party; and (iii) that, as a result of the foregoing, the Company's total addressable market was overstated.

47. On March 12, 2021, the Individual Defendants caused Berkeley Lights to file its annual report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-

K"), affirming the previously reported financial results. It claimed that the Berkeley Lights platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process." Regarding the increase in product revenues, the report stated:

> Product revenue increased by $8.1 million, or 19% for the year ended December 31, 2020, compared to the year ended December 31, 2019. The increase during the year ended December 31, 2020 compared to December 31, 2019, was primarily driven by an increase of $3.8 million in consumables sales driven by additional demand from our customers due to the increase in our installed base, an increase of $3.3 million from platform and system sales, including sales-type lease arrangements and license arrangements related to our workflows, and an increase of $1.0 million in subscription arrangement and related revenue driven by the launch of our subscription access program in February 2020. During the year ended December 31, 2020 we sold 27 platforms compared to 26 platforms during the year ended December 31, 2019. Revenue from platform and system sales in the year ended December 31, 2020 as compared to the prior year was impacted by the regional mix of the platform placements as well as the mix of system type placed.

48.     The above statements in ¶ 47 were materially misleading because they failed to disclose: (i) that Berkeley Lights's flagship instrument was deeply flawed and suffered from breakdowns, high error rates, and data integrity issues; (ii) that, as a result, the Company's revenues were declining, which were masked by channel stuffing through a related party; and (iii) that, as a result of the foregoing, the Company's total addressable market was overstated.

**C.      The Truth Fully Emerges**

49.     On September 15, 2021, Scorpion Capital published a research report criticizing the Company's technology and questioning its business relationships and business growth plan. Citing interviews with former employees, industry scientists, and end users across 14 of Berkeley Lights's largest customers, the report alleged that a "trail of customers . . . were 'tricked,' misled, or over-promised into buying a $2 million lemon." The report pointed out that the "quality of revenue and its mix has rapidly deteriorated as well." Specifically, it stated that "services revenue – training, support, and other low quality items – as a percent of total has spiked and accelerated in recent quarters, to 32% of total revenue in the June period." Moreover, "[t]he percentage from 'joint development agreements' – a glorified term for time and materials for handholding on custom assays and such – has grown to an alarming 20% of sales."

50.     The report further alleged that the Company's machines are hardly used by customers, citing that "[f]or the latest quarter, we calculate consumable revenues per machine at a mere $43K – or about 2 to 3 runs per quarter per machine." The "trend has recently worsened, as consumable revenues are down 18% over the last 3 quarters, despite the installed base going from 75 to 92."

51.     Moreover, the report claimed that to mask this sales decline, Berkeley Lights engaged in channel stuffing due to the "sudden, unexplained shift to distributor-based revenue over the last 2 quarters, from almost nothing to half of sales." There were two indicators signaling the Company stuffed the channel: (i) "spiking receivables . . . , where A/R [accounts receivable] has jumped 50% in 3 quarters while sales fell 11%" and (ii) "customer concentration – also jumping, with a large unidentified customer comprising 27% of revenue and 28% of A/R in the June quarter."

52.     The report stated that "All 14 customers [interviewed by Scorpion Capital] indicated that BLI's machine is a flop." It summarized the interviews as follows:

> <u>Amgen</u> employee #1, a scientist and group leader who has interfaced closely with BLI for 5+ years: error rate is a shocking "50% higher" than a standard lab instrument; scientists internally resist using it. Amgen is a top 15 pharma/biotech globally with ~$125B market cap. An early BLI backer, we believe Amgen is their largest install with 5-10 machines. BLI's CEO appears to hype Amgen "validation" at every investor event.
>
> <u>Amgen</u> employee #2, another scientist and group leader, who has been "living" with the system "on a daily basis" for 2 years: can't trust the data; machine breaks down.
>
> <u>Bristol Myers Squibb</u> employee #1: BLI machines are "not being used much"; a waste of money; scientists are skeptical and reluctant; no value proposition; onerous and unusable. BMS originally funded BLI, making it one of their largest customers with what we believe to be ~5 machines. BMS is a top 10 pharma/biotech with ~$150B market cap.
>
> <u>Bristol Myers Squibb</u> employee #2, now an ex-executive who was involved in bringing in and championing BLI: pitifully small TAM; already saturated; "very expensive doorstop" prone to "lot of false positives and negatives"; overpriced vs. alternatives.
>
> <u>Pfizer</u> senior scientist in antibody discovery group describes a debacle: error rates of 50-100%; implies key product claims and capabilities are false; struggled for 2-3 years trying to get the product to work; speaks with other large customers – "consensus is very similar." Pfizer is the third largest biotech/pharma globally with ~$250B market cap.

<u>Novartis</u> ex-manager describes a farce: we got "tricked" and machine doesn't work; "failed purchase" that he wanted to return; 50% error rates; data couldn't be validated and was "all over the place"; too unreliable for FDA submissions; using it again would put the reputation of his current employer (a CDMO) at risk; other large customers also regret the purchase. Novartis is sixth largest player with ~$225B market cap.

<u>AbbVie</u> scientist who leads drug discovery teams says they have 2 machines and implies that they regret buying them; equipment mostly sit idle; portrays a disaster where 40-50% of cells are ruined during runs; 50% error rate; still "kind of like a beta version" despite being launched in 2016; "major headache," "tedious."

<u>IQVIA</u> executive at world's largest contract research organization (CRO), with 70K employees and $50B market cap, has broad visibility into how pharma/biotech customers view BLI: key accounts are unhappy and not referenceable; BLI claims are bogus; warns IQVIA customers to stay away from BLI's tool; one of the worst vendors they rate; no traction in industry; not winning much new business.

<u>Gilead</u> scientist, who has 5 years of experience with the instrument at previous employers, has declined to recommend a purchase at Gilead: instrument often fails; standard assays that "just flat out didn't work"; key parts of value proposition are misleading and/or false; extremely small TAM; suggests BLI pipeline has dwindled in last 4-6 months. Gilead is a top 20 player with $90B market cap.

<u>Takeda</u> lead scientist: spent a year trying to find uses for the tool and now it's barely used; dismayed at lack of evidence/data proving its value; unusable for early stage drug discovery; negligible TAM; just an overpriced mash-up of cheap, commonplace lab tools; emerging competitors are cheaper and better. Takeda is an Asia-based pharma with $50B market cap.

<u>Harbour Biomed</u> ex-executive closely involved in BLI purchase says they would have sent it back for a refund if they could; 80-90% failure rate for complex antibodies; "lot of false positives" and errors; cost to buy and operate is out of control; BLI can't support the machine and staff seemed out of their depth. Harbour is a publicly-traded mid-tier biotech in Asia.

<u>Lonza</u>, one of the largest contract manufacturer/drug developers (CMO/CDMO) with $60B market cap: scientist in leadership role says two different business units "extensively tested" the machine and passed: "value proposition was not there"; will be obsolete in 2-3 years; slammed the tool as absurdly expensive to own and run; price needs to drop by 75-85% to have a shot; others sell "a lot more functionality" for a fraction of the cost.

<u>Samsung Biologics</u> is also one of the largest CMO/CDMO's with $54B market cap, yet appears to have only one BLI machine: ex-lead scientist says the machine is "not a good investment"; "I don't think it's worth $2MM"; virtually no time savings in cell line development.

<u>Chan Zuckerberg Biohub</u>, a nonprofit initiative funded by Facebook's founder, may be BLI's second or third largest customer with 5 machines. Scientist closely involved in purchase decision suggests they have to exhaust a $700MM cap ex budget within 3 years and are blindly gambling on anything "new"; says wouldn't personally buy the machine; "would not feel comfortable"; tool not suited for commercial drug discovery where you have to "actually deliver" something.

UCSF, NIH, and other academic customers. Former BLI scientist details how universities and research institutions had experiences as disastrous as commercial pharma/biotech customers: UCSF and NIH both returned the equipment after 6-9 months; couldn't get publishable data of the system; chose cheaper, faster boxes from 10X Genomics and others.

A leading academic institution (name redacted) purchased a machine and then hired a former BLI scientist in a senior role. The scientist helped develop the instrument and is one the most knowledgeable experts in single cell technology. We redact the institution's name, given the startling nature of the scientist's feedback, who is uniquely positioned to comment as both an ex-employee and current customer: machine fails in 90% of experiments; the field is 'very skeptical and rightfully so"; can't get BLI data through peer view; software bugs; contamination issues; doesn't recommend the tool and not suited for commercial pharma/biotech customers; unusable by most scientists.

Gingko Bioworks announced a purported "$150MM deal" with BLI in 2019. We spoke with two executives. Both hesitated when we asked if they'd ever personally invest in BLI; wouldn't confirm if they paid for their 3 machines; "jury is still out" 24 months later, still just "a concept on paper"; questioned the value proposition and hesitated to recommend the tool; not usable by typical biotech/pharma companies; still 50/50 whether experiments work or fail; implied the actual deal size is radically smaller

53.     On this news, the Company's stock price fell 30% over two consecutive trading sessions to close at $23.53 per share on September 16, 2021, on unusually heavy trading volume.

**D.     Defendants Holt, Marks, Rothman, and Khandros Sold Nearly $175 Million in Berkeley Lights Stock While in Possession of Material Non-Public Information**

Holt

54.     Defendant Holt was the Company's CFO with a highly sophisticated understanding of the Company's results and their import.

55.     As set forth herein, defendant Holt possessed material negative information which he knew was being concealed from investors.  Defendant Holt consciously acted to exploit his knowledge by selling 171,231 shares of Berkeley Lights stock to his substantial benefit on March 11, 2021 for $53.93 per share, receiving $9,262,833 in gross proceeds.

56.     Defendant Holt thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Marks

57.     Defendant Marks is a director of the Company with a highly sophisticated understanding of the Company's results and their import.

58.    As set forth herein, defendant Marks possessed material negative information which he knew was being concealed from investors.  Defendant Marks consciously acted to exploit his knowledge by selling over $48 million of Berkeley Lights stock to his substantial benefit, including in the SPO, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 11/23/20 | 362,586 | $82.56 | $29,935,100 |
| 12/10/20 | 55,162 | $82.56 | $4,554,175 |
| 3/1/21 | 20,000 | $61.93 | $1,238,598 |
| 3/2/21 | 20,000 | $62.22 | $1,254,471 |
| 3/3/21 | 1,740 | $61.26 | $107,083 |
| 3/9/21 | 30,000 | $53.30 | $1,607,525 |
| 3/10/21 | 100,000 | $52.81 | $5,306,614 |
| 3/11/21 | 28,260 | $54.19 | $4,463,683 |
| | **617,748** | | **$48,467,249** |

59.    Defendant Marks thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Rothman

60.    Defendant Rothman is a director of the Company with a highly sophisticated understanding of the Company's results and their import.

61.    As set forth herein, defendant Rothman possessed material negative information which he knew was being concealed from investors.  Defendant Rothman consciously acted to exploit his knowledge by selling over $13 million of Berkeley Lights stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 3/3/21 | 72,000 | $60.03 | $4,334,276 |
| 3/4/21 | 24,155 | $53.23 | $1,301,096 |
| 3/5/21 | 140,000 | $52.75 | $7,385,000 |
| | **236,155** | | **$13,020,372** |

62.    Defendant Rothman thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Khandros

63.    Defendant Khandros is a director of the Company with a highly sophisticated understanding of the Company's results and their import.

64.     As set forth herein, defendant Khandros possessed material negative information which he knew was being concealed from investors.  Defendant Khandros consciously acted to exploit his knowledge by selling $  of Berkeley Lights stock to his substantial benefit, including in the SPO, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/23/2020 | 1,049,696 | $82.56 | $86,662,902 |
| 12/10/2020 | 159,692 | $82.56 | $13,184,172 |
| | **1,209,388** | | **$99,847,074** |

65.     Defendant Khandros thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

## VI.     DAMAGES TO THE COMPANY

66.     As a direct and proximate result of the Individual Defendants' conduct, Berkeley Lights has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.     Legal fees incurred in connection with the Securities Class Action;

b.     Any funds paid to settle the Securities Class Action;

c.     Misappropriation of concealed inside information by insiders for the purposes of improper stock transactions; and

d.     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Berkeley Lights.

67.     In addition, Berkeley Lights's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

68.     The actions complained of herein have irreparably damaged Berkeley Lights's corporate image and goodwill.  For at least the foreseeable future, Berkeley Lights will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Berkeley Lights's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.    Plaintiff brings this action derivatively in the right and for the benefit of Berkeley Lights to redress injuries suffered, and to be suffered, by Berkeley Lights as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, and contribution for violations of Section 10(b) of the Exchange Act.   Berkeley Lights is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.    Plaintiff will adequately and fairly represent the interests of Berkeley Lights in enforcing and prosecuting its rights.

71.    Plaintiff has continuously been a shareholder of Berkeley Lights at times relevant to the wrongdoing complained of and is a current Berkeley Lights shareholder.

72.    When this action was filed, Berkeley Lights's Board of Directors consisted of nine directors: defendants Boyce, Chiminski, Khandros, Lucier, Moritz, Nelson, and Rothman and non-party directors Kadia, and Hopfield.   Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Defendants Boyce, Marks, and Nelson**

73.    Boyce, Marks, and Nelson served as the members of the Audit Committee at all relevant times.   As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.   In their capacities as Audit Committee members, Boyce, Marks, and Nelson reviewed and approved the Company's disclosures, including revenue growth and customer complaints about the Company's core product.   As alleged herein, Boyce, Marks, and Nelson failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Berkeley Lights's SEC filings and other disclosures.   Thus, Boyce, Marks, and Nelson breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Boyce, Chiminski, Khandros, Lucier, Moritz, Nelson, and Rothman**

74.     Each of Boyce, Chiminski, Khandros, Lucier, Moritz, Nelson, and Rothman managed the Company and was affirmatively aware of significant developments in its core business.  The Company's revenue relies on the performance of the Berkeley Lights platform. Accordingly, knowledge of the truth regarding its defects and customer complaints was known by each of Boyce, Chiminski, Khandros, Lucier, Moritz, Nelson, and Rothman at all relevant times. The decisions of each Boyce, Chiminski, Khandros, Lucier, Moritz, Nelson, and Rothman to permit misleading statements and the concealment of material facts were not valid exercises of business judgment and demand is excused on that basis

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

75.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Berkeley Lights's business and affairs, particularly with respect to issues as fundamental as public disclosures.

77.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Berkeley Lights.

78.     In breach of their fiduciary duties owed to Berkeley Lights, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

79.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly represent the demand for Berkeley Lights's products in China.

80.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Berkeley Lights has sustained and continues to sustain significant damages.

Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Holt, Marks, Rothman, and Khandros – *Brophy* Claim

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     As alleged above, Holt, Marks, Rothman, and Khandros are fiduciaries of Berkeley Lights, possessed material, non-public information of Berkeley Lights, and used that information improperly to profit from sales of Berkeley Lights stock. When Holt, Marks, Rothman, and Khandros directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

83.     When Holt, Marks, Rothman, and Khandros sold their Berkeley Lights stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of Berkeley Lights stock would be significantly lower. Holt, Marks, Rothman, and Khandros timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating Berkeley Lights's non-public information.

84.     Plaintiff has no adequate remedy at law.

## COUNT III

### Against Defendants Hobbs, Holt, and Wood for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     Defendants Hobbs, Holt, and Wood are named as defendants in the related securities class action. The conduct of these Defendants, as described herein, has exposed the

Company to significant liability under various federal and state securities laws by their disloyal acts.

87.     Berkeley Lights is named as a defendant in a related securities class action that alleges and asserts claims arising under Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Berkeley Lights is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

88.     As officers, directors and otherwise, defendants Hobbs, Holt, and Wood had the power or ability to, and did, control or influence, either directly or indirectly, Berkeley Lights's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

89.     Defendants Hobbs, Holt, and Wood are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

90.     Defendants Hobbs, Holt, and Wood have damaged the Company and are liable to the Company for contribution.

91.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Berkeley Lights, demands judgment as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Berkeley Lights and that plaintiff is an adequate representative of the Company;

1    B.    Against all of the defendants and in favor of the Company for the amount of
2 damages sustained by the Company as a result of the defendants' breaches of fiduciary duties,
3 waste of corporate assets, and unjust enrichment;

4    C.    Declaring that Defendants have breached and/or aided and abetted the breach of
5 their fiduciary duties to Berkeley Lights

6    D.    Directing Berkeley Lights to take all necessary actions to reform and improve its
7 corporate governance and internal procedures to comply with applicable laws and to protect
8 Berkeley Lights and its stockholders from a repeat of the damaging events described herein,
9 including, but not limited to, putting forward for stockholder vote, resolutions for amendments to
10 the Company's Bylaws or Articles of Incorporation and taking such other action as may be
11 necessary to place before stockholders for a vote of the following corporate governance policies:

12        1.  a proposal to strengthen the Company's controls over financial reporting;

13        2.  a proposal to strengthen the Board's supervision of operations and develop and
14 implement procedures for greater stockholder input into the policies and guidelines of the Board;

15        3.  a proposal to strengthen Berkeley Lights's oversight of its disclosure procedures;

16        4.  a provision to control insider transactions; and

17        5.  a provision to permit the stockholders of Berkeley Lights to nominate at least three
18 candidates for election to the Board;

19    E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and
20 state statutory provisions sued hereunder, including attaching, impounding, imposing a
21 constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their
22 other assets so as to assure that plaintiff on behalf of Berkeley Lights has an effective remedy;

23    F.    Awarding to Berkeley Lights restitution from defendants, and each of them, and
24 ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

25    G.    Awarding to plaintiff the costs and disbursements of the action, including
26 reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

27    H.    Granting such other and further relief as the Court deems just and proper.

28

---

1

## JURY DEMAND

2

Pursuant to Fed. R. Civ. P. 38(b), plaintiff a trial by jury.

3

DATED: March 16, 2022                    **GLANCY PRONGAY & MURRAY LLP**

4

By:    */s/ Pavithra Rajesh*

5                                                        Robert V. Prongay
                                                         Pavithra Rajesh

6                                                        1925 Century Park East, Suite 2100
                                                         Los Angeles, CA 90067

7                                                        Telephone:  (310) 201-9150
                                                         Facsimile:  (310) 201-9160

8                                                        Email: rprongay@glancylaw.com
                                                         Email: prajesh@glancylaw.com

9

10                                                       Benjamin I. Sachs-Michaels
                                                         712 Fifth Avenue

11                                                       New York, NY 10019
                                                         Telephone: (212) 935-7400

12                                                       Facsimile: (212) 756-3630
                                                         Email: bsachsmichaels@glancylaw.com

13

14

15                                                       *Attorneys for Plaintiff Trung Nguyen*

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Trung Nguyen, do hereby verify that I am a holder of common stock of Berkeley Lights, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  3/16/2022

*Trung Nguyen*
_____
Trung Nguyen